## LATSES et al. v. NICK FLOOR, Inc.

No. 6237.   Decided July 27, 1940.   (104 P. 2d 619.)

216

*Allen T. Sanford* and *E. A. Rogers,* both of Salt Lake City, for appellants.

*Willard Hanson, Stewart M. Hanson, D. N. Straup,* and *L. E. Cluff,* all of Salt Lake City, for respondent.

PRATT, Justice.

Appellants, Latses and Sdrales, instituted this action of unlawful detainer. The premises involved are No. 79 West Second South Street in Salt Lake City, Utah. They are a part of a building known as the Eagle Block. Respondent, Nick Floor, Inc., the tenant, has occupied the premises since September 25, 1933. Appellants purchased the property—the Eagle Block—May 31, 1939. Two days later—June 2d —they gave respondent written notice to vacate No. 79 on or before July 1, 1939. Respondent refused to move. This action followed.

For many years, one A. H. Ball, and his father preceding him, looked after the Eagle Block for the Stockyards National Bank of South Omaha, the W. P. Noble Company, and the Fred Bragg Estate, the former owners of that building. These owners were non-residents of this state. In the management of the Eagle Block, the father, and after his death, the son, performed such duties as renting space in the building, collecting rents, making repairs, paying taxes, paying expenses, paying insurance premiums, receiving tax notices in their names as agent, and after deducting expenses, forwarding to each owner its share of the balance. In case of a shortage of money, the agents with written consent of the W. P. Noble Company, borrowed money at the bank. Monthly they sent reports to the owners showing money collected, expenses paid, including therein instalment payments upon money borrowed from the bank, and forwarding the balance, if any, with these reports. Important

changes, improvements, or repairs were usually taken up with the owners before expense for them was incurred. The agents received a salary which does not appear to have been contingent either upon the amount of rents collected, or upon the fact that there were or were not rents collected. At times written leases were taken for space in the building, but there is no evidence of any authority in writing to either of these agents to execute a lease for longer than a year.

On September 25, 1933, respondent and A. H. Ball entered into a written lease, Mr. Ball signing his name as agent of the corporate and estate owners named above. In that lease we find these provisions:

"* * * To have and to hold the said premises, together with the appurtenances unto the said Lessee, his executors, administrators and assigns, from the 25th day of September, A. D. 1933, for and during and until the 25th day of September, A. D. 1936, a term of three years.

* * *

"For and in consideration of the expenditure by Lessee in permanent improvements in and on said store and basement to the extent of one thousand dollars ($1000.00), said improvements to be completed on or before the first day of May 1935, an option, under the same terms as herein set forth, for an additional five years is hereby granted, said option to be exercised on or before thirty days prior to the expiration of the three year period herein mentioned. In case said option is exercised, a monthly rental of Ninety Dollars ($90.00) shall be paid in advance each month during said five year period."

The representatives of those owners who testified at the trial denied any knowledge of such a lease, and contended that the agent had no authority to enter into it.

Appellants applying the principle of the case of *Utah Loan & Trust Co.* v. *Garbutt,* 6 Utah 342, 23 P. 758, took the view that the acceptance of rent from month to month upon a lease void under our statute of frauds, made the tenancy one from month to month. In their complaint they allege the "lease" was from month to month and in their

reply that the lease is void in view of Sections 33-5-1 and 33-5-3, R. S. U. 1933. These Sections read:

"33-5-1. *Estate or Interest in Real Property.*

"No estate or interest in real property, other than leases for a term not exceeding one year, nor any trust or power over or concerning real property or in any manner relating thereto, shall be created, granted, assigned, surrendered or declared otherwise than by act or operation of law, or by deed or conveyance in writing subscribed by the party creating, granting, assigning, surrendering or declaring the same, or by his lawful agent thereunto authorized by writing."

"33-5-3. *Leases and Contracts for Interest in Lands.*

"Every contract for the leasing for a longer period than one year, or for the sale, of any lands, or any interest in lands, shall be void unless the contract, or some note or memorandum thereof, is in writing subscribed by the party by whom the lease or sale is to be made, or by his lawful agent thereunto authorized in writing."

Respondent in its answer claims that appellants are estopped to raise the defense of the Statute of Frauds in view of the fact that respondent complied with the $1000 permanent improvement provision of the lease, which we have quoted above; and payments of the increased rent and the improvements were accepted with knowledge of the existence of the lease, and that appellants as purchasers were in no better position than their grantors.

There is no question but that appellants' position is no stronger than that of their grantors. Their is testimony in the record that they had actual knowledge of the lease before they purchased, but whether they did or did not, they took with their eyes open. They were put on inquiry as to the status of respondent's occupancy.

*Meagher* v. *Dean*, 97 Utah 173, 91 P. 2d 454.

As to the improvements, the lower court made the following finding:

"* * * The court further finds without dispute that the defendant, in virtue of the written lease attached to its answer and

under which it was put in possession of and occupied the premises, on or before May 1, 1935 and in accordance with the terms and provisions of the said lease, made permanent improvements in said storeroom and basement so let and occupied by it, to the reasonable value in excess of the sum of $1,000.00, to wit, more than $1,700.00, by putting in a maple hardwood floor, building new stairways, putting in toilets and partitions, installing electric wiring, building and putting in new doors, putting in a valuable plate glass window in front of the building, doing plumbing work and making sewer connections, putting in tiling and panel work, constructing a cement stairway, putting up valuable and permanent awnings, doing inside and outside painting in preservation of the premises, laying and gluing to the floor valuable and durable linoleum.  *  *  *"

The consideration for the extension of the term was the making of the required permanent improvements on or before May 1, 1935. These improvements, if made, initiated respondent's right to the extension. If made, then the consideration for the extension of the term was performed, and so far as that element is concerned, the the case was not within the statute of frauds. We invite attention to the annotation in 33 A. L. R. 1489; *Kerr* v. *Hillyard*, 51 Utah 364, 170 P. 981; and *Bamberger Co. et al.* v. *Certified Productions, Inc., et al.*, 88 Utah 194, 48 P. 2d 489.

This court has recognized the principle that improvements placed upon premises may take the contract out of the statute of frauds even to the extent of requiring a conveyance of the property upon an oral agreement. *Price* v. *Lloyd*, 31 Utah 86, 86 P. 767, 8 L. R. A., N. S., 870; *Hargreaves* v. *Burton*, 59 Utah 575, 206 P. 262, 33 A. L. R. 1481. Certainly if a conveyance may be had upon an oral agreement so taken out of the statute, an extension of the term of a lease should be granted upon the same grounds. Leases have been extended before upon such grounds. 33 A. L. R. 1489, 1510; *Read Drug & Chemical Co.* v. *Nattans*, 129 Md. 67, 98 A. 158. The Utah cases cited above bring out the fact that the improvements must be such as are indicative of something more than repairs

that a tenant from month to month might make simply for his own convenience. Under the lease in question, they were to be *permanent* improvements.

During the trial it was stipulated by the parties that there was no issue as to the amounts expended for improvements nor as to the reasonableness of those expenditures—the issue was limited to the question of whether or not the improvements made were permanent. The following we believe to be permanent improvements under the circumstances of this case: Tiling in front of premises, board floor with maple top, stairs in broken stairway, repair of men's toilet and construction of ladies' toilet, and connecting them with sewer, changing old wooden steps on West Temple side of building to cement, modern electric wiring of No. 79, outside painting, placing floor ventilator, and placing paneling inside. Other work than this was done, but these items which add to about $1,228.06 are such as have considerable permanency in their installation. It is not likely that a tenant from month to month would make such improvements merely as a convenience to himself or on any theory that he had by usage created the necessity for such repairs. The lower court was justified in finding that permanent improvements in the amount required had been placed on the premises.

But there is another very important point in connection with this question. That is one of knowledge on the part of the principals that improvements had been made. The defense of the statute of frauds may not be used as a means of defrauding a party to a contract. If he has performed his side of the agreement, the other party may not accept the benefits of that performance and deny the liabilities (*Floor* v. *Mitchell et al.,* 86 Utah 203, 41 P. 2d 281); but this presupposes that he who accepts those benefits has actual or constructive knowledge of their existence.

The evidence in this case is very questionable as to whether the former owners had actual knowledge of the improvements, particularly the Bragg Estate. That being the case, were the facts sufficient to justify attributing constructive knowledge to them? There is no justification for the casting of appellant's aspersions of fraud, deceit, and wrongdoing upon the agent, Mr. Ball, and upon the respondent. There is nothing showing an interest in Mr. Ball adverse to that of his principals. The facts limit us strictly to a question of whether or not knowledge of an agent required in an effort to carry out a void agreement can be attributed to the principal.

Unquestionably if the proof of the agency rests upon the void agreement, knowledge acquired as a result of entry into the agreement could not be imputed to the principal. That, however, is not the situation here. It is not denied that Ball was an agent to the extent we have first enumerated above —an employee manager. He was looking after the building in all respects. Any changes made therein would come, and of course in this case, did come to his knowledge in the course of such general duties as well as by the agreement. Those improvements were of such a nature and materiality to those general duties as to require of him a report concerning them to his employers. Knowledge of them under such circumstances is imputable to his employers (*B. T. Moran, Inc.*, v. *First Security Corp.*, 82 Utah 316, 24 P. 2d 384), unless there is something about having initiated the improvements by a void agreement that makes an exception to the rule in this case. We do not think it makes any difference how they were initiated, if the agent's interests are not adverse to those of his principals. Mechem on Agency, 2d Ed., vol. 2, § 1813, p. 1397, reads as follows:

"The law imputes to the principal, and charges him with, all notice or knowledge relating to the subject-matter of the agency which the agent acquires or obtains while acting as such agent and within the scope of his authority, or, according to the weight of authority, which

he may previously have acquired and which he then had in mind, or which he had acquired so recently as to reasonably warrant the assumption that he still retained it. Provided, however, that such notice or knowledge will not be imputed: (1) Where it is such as it is the agent's duty not to disclose; (2) Where the agent's relations to the subject-matter are so adverse as to practically destroy the relation of agency; and, (3) Where the person claiming the benefit of the notice, or those whom he represents, colluded with the agent to cheat or defraud the principal.

"This rule does not depend, in either case, upon the fact that the agent has disclosed the knowledge or information to his principal; subject to the exceptions named, the law conclusively presumes that he has done so, and charges the principal accordingly."

See, also, *First Nat. Bank of Reedley* v. *Reed*, 198 Cal. 252, 244 P. 368; *Tremont Trust Co.* v. *Noyes et al.*, 246 Mass. 197, 141 N. E. 93; and *Maryland Casualty Co. of Baltimore, Md.*, v. *Queenan*, 10 Cir., 89 F. 2d 155; and *Stevens* v. *Mulcahy, et al.*, 261 Mass. 116, 158 N. E. 344.

The imputation of the agent's knowledge to his principal is for the protection of the innocent third party who deals with the agent in good faith. There is no bad faith shown on the part of the respondent (the third party) in this case. That he made a mistake in law—in his failure to understand that an agent to convey an interest in land must have written authority—is evidence of ignorance, but no bad faith. Bad faith implies the deliberate doing of something the actor knows to be wrong or erroneous. From a lack of knowledge of law, we may not infer wrong doing. One may visit an attorney—as respondent did in this case—and come away with the wrong advice or a misunderstanding of what was told to him, but we do not presume wrong doing on his part from such circumstances.

We are of the opinion that the former owners—grantors of appellants—had constructive knowledge of the improvements, accepted them as a result, accepted the additional rent; and under all the circumstances, are

estopped to raise the defense of the statute of frauds. The lower court was not in error in so holding.

An objection raised by appellants to the lower court's decision arises out of the fact that in September, 1933, when the lease was signed by Ball as agent and by the respondent, the National Bank of South Omaha was in the hands of trustees, Dressler and Hoyt by name; that under such circumstances the lease was a nullity as to them. There seems to be no question but that this was the fact. The agent Ball did not know of this change when the lease was made. However, we do not think that will change the situation in this case. The money forwarded and reports forwarded to the Bank were received and accepted by Dressler. No objection was raised by him or his co-trustee that they were not to be bound by Ball's acts as manager of the Eagle Block. Correspondence passed between Dressler and Ball concerning the building. In every respect, Dressler and Hoyt were in the same position as the Noble Company and the Bragg Estate as to the renting of space in the Eagle Block.

In the lease we find this provision:

"* * * and either party agrees to pay all costs and attorney fees and expenses incurred by the other that shall arise from enforcing the covenants of this lease."

The lower court in deciding in favor of respondent awarded it $500 as attorney's fees. Appellants take exception to this allowance on the ground that there is no privity between them and respondent, and that this covenant is not one running with the land. We are of the opinion that appellants are correct in their version of this part of the case. This was purely a personal covenant as between the parties to the contract. Though appellants purchased the property subject to the tenancy, they did not expressly agree to abide by all the terms of the lease. They would be bound only by covenants in the lease which affect-

ed the estate or the interest in the land conveyed or leased. 14 Am. Jur. § 27, p. 503, and § 29, p. 505.

The case is remanded with direction to the lower court to vacate the judgment for $500 attorney's fee. So modified, the judgment is affirmed. Costs to respondent.

MOFFAT, C. J., and LARSON and McDONOUGH, JJ., concur.

WOLFE, Justice.

I concur. The Statute of Frauds requiring the agency as well as the lease to be in writing presents only an evidentiary barrier. If that be removed it is as if no Statute of Frauds existed. But still the defendant would be required to prove his contract with the predecessors of plaintiffs', that is, a right to continue to occupy the premises. In order to do this he would still be required to prove either that A. H. Ball had apparent authority to make the contract although not actual authority, or that he had actual authority. The fact that the obstacle of the Statute of Frauds has been hurdled still leaves to be proved the contract with the principal because the respondent (defendant) must stand on that or else on an estoppel which prevents plaintiffs from asserting that there was no such contract. The evidence is sufficient to show that Ball did have either the actual authority to make leases, or, if not that, his course of conduct over a number of years in reference to the building known to respondent was such as reasonably to permit deduction by respondent that Ball possessed such authority. The mere fact that he was the manager of a business block would go a long way to permit an inference of authority to make reasonably long term leases. The Statute of Frauds being out of the way, as explained in the main opinion, the connecting link between Ball and the predecessors of plaintiffs was established in such manner as to make the action of Ball the actions of his principal.